UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------X
JULIA JOHNSON,

                           Plaintiff,


          -against-


EDDIE JAMES MYERS, JR., DONNA GUARTON,
psychologist, BENJAMIN MALEWICZ, JODY
WEITZMAN-FISHER, P.O. PATTERSON,          <u>MEMORANDUM & ORDER</u>
Shield No. 658, 1st Precinct Command,     10-CV-1964(JS)(WDW)
ROBERT BARRIS, M.D., DR. G. ST. VICTOR,
NASSAU COUNTY BALDWIN, U.F.S.D., ARTHUR
A. GIANELLA, President/CEO Nassau
University Medical Center, JOHN CIAMPOLI,
Nassau County Attorney, JUSTICE KAREN
MURPHY, Nassau County Supreme Court,
CYRUS R. VANCE, JR., New York County
District Attorney,

                           Defendants.
----------------------------------------X
APPEARANCES
For Plaintiffs:            Julia Johnson, <u>pro</u> <u>se</u>
                           588 Powell St.
                           Brooklyn, NY 11212
                           c/o Stella Gordon


For Defendants
Eddie James Myers, Jr.:    Danielle J. Seid, Esq.
                           Lance D. Simon, Esq.
                           Law Offices of Anthony A. Capetola
                           Two Hillside Avenue, Building C
                           Williston Park, NY 11596


Malewicz, Weitzman-
Fisher, Patterson,
and Ciampoli:              Pablo A. Fernandez, Esq.
                           Liora M. Ben-Sorek, Esq.
                           Nassau County Attorney's Office
                           One West Street
                           Mineola, NY 11501

SEYBERT, District Judge:

Plaintiff Julia Johnson ("Plaintiff") commenced this action pro se on behalf of herself and her infant son, DJM, on April 23, 2010. Currently pending before the Court are: (1) a motion for summary judgment filed by defendants Benjamin Malewicz, Jodi Weitzman s/h/a Jody Weitzman-Fisher, and Police Officer Kenneth Petterson s/h/a P.O. Patterson (together, the "County Defendants"); and (2) a motion for summary judgment filed by defendant Eddie James Myers, Jr. ("Myers" and together with the County Defendants, "Defendants"). For the following reasons, both motions are GRANTED.

BACKGROUND

I.   Procedural History

The Court assumes familiarity with the procedural history of this case and will briefly summarize it as follows:

Plaintiff commenced this action pro se on behalf of herself and her infant son, DJM, asserting various claims against DJM's father, Myers; the County Defendants; Baldwin Union Free School District and school psychologist, Donna Guarton (together, the "School District Defendants"); Dr. Robert Barris, Dr. G. St. Victor, and Arthur A. Gianella of the Nassau University Medical Center ("NUMC") (together, the "NUMC Defendants"); New York County

2

District Attorney Cyrus R. Vance, Jr.; and Nassau County Supreme Court Justice Karen Murphy.

On June 29, 2010, the NUMC Defendants filed Answers to the Complaint. (Docket Entries 18-20.) On August 30, 2010, the County Defendants also answered the Complaint. (Docket Entry 39.)

The School District Defendants, District Attorney Vance, and Myers all filed motions to dismiss on July 26, September 20, and December 14, 2010, respectively. (Docket Entries 26, 46, 64.) On February 23, 2011, this Court dismissed all claims against the School District Defendants and District Attorney Vance. (Docket Entry 77.) With respect to Myers, the only claim that survived the motion to dismiss was Plaintiff's defamation claim against him. (Docket Entry 77.) Myers filed an Answer with respect to this claim on June 1, 2011. (Docket Entry 96.)

On May 25, 2011, the NUMC Defendants moved for summary judgment on all claims (Docket Entries 90-94), which the Court granted in their favor on December 6, 2011 (Docket Entry 107).

After warning Plaintiff that she could not represent her infant son pro se, the Court dismissed all claims brought on behalf of DJM on January 27, 2012. (Docket Entry 121.)

On June 28, 2012, the Court dismissed all claims against Justice Murphy on the ground of judicial immunity. (Docket Entry 130.)

On March 4, 2013, Myers and the County Defendants, the only remaining defendants in the case, both moved for summary judgment on the claims remaining against them. (Docket Entries 151, 154.) These motions are currently pending before the Court.

II. Factual Background[1]

On June 20, 2008, the Nassau County Child Protective Services ("CPS") received a report from the New York Statewide Central Register of Child Abuse and Maltreatment[2] detailing

---

[1] Although Defendants served Plaintiff with the required notice to pro se litigants opposing motions for summary judgment, see LOCAL CIV. R. 56.2, Plaintiff failed to file a proper 56.1 Counterstatement. Rather, Plaintiff filed "Statements of Material Facts Responses," which do not specifically address any of the material facts set forth in Defendants' 56.1 Statements or contain citations to admissible evidence. (See Pl.'s Stmt. to Myers' Mot., Docket Entry 148; Pl.'s Stmt. to Cnty. Defs.' Mot., Docket Entry 149.) The Court therefore finds as true the facts contained in Defendants' 56.1 Statements to the extent that they are supported by admissible evidence. See LOCAL CIV. R. 56.1(c) ("Each numbered paragraph in the statement of material facts set forth in the statement required to be served by the moving party will be deemed to be admitted for purposes of the motion unless specifically controverted by a correspondingly numbered paragraph in the statement required to be served by the opposing party."); LOCAL CIV. R. 56.1(d) ("Each statement by the . . . opponent . . . controverting any statement of material fact[ ] must be followed by citation to evidence which would be admissible, set forth as required by Fed. R. Civ. P. 56(c)."). The Court notes that this is not the first time in this case that Plaintiff has failed to comply with Rule 56 despite adequate notice. See Johnson v. Myers, No. 10-CV-1964, 2011 WL 6131003, at *1 n.1 (E.D.N.Y. Dec. 6, 2011).

[2] The Statewide Central Register is a hotline that receives reports alleging child abuse or maltreatment within New York State and forwards such reports to the local child protective service for investigation. See http://www.ocfs.state.ny.us/main/cps/.

4

suspected child abuse or maltreatment of DJM by Plaintiff. (Cnty. Defs.' 56.1 Stmt., Docket Entry 156, ¶ 1.) The report originated from a mandated reporter at Brookside Elementary School who had observed unusual behavior indicating that Plaintiff was delusional, paranoid, and unable to make adequate or safe decisions for DJM. (See Fernandez Decl. Ex. C at 1; Pl.'s Stmt. to Cnty. Defs.' Mot. at 31[3].) Examples of Plaintiff's behavior included her refusal to sign emergency contact forms or to provide her home telephone number to the school; her refusal to sign permission slips; and that she had sent incoherent letters to the Federal Bureau of Investigation and the Commissioner of Schools on Long Island containing false information regarding a school incident relating to another student. (Cnty. Defs.' 56.1 Stmt. ¶¶ 1, 14; Fernandez Decl. Ex C. at 1.)

After receiving the report, Jodi Weitzman ("Weitzman"), a caseworker employed by CPS, made an unannounced visit to Plaintiff's home to investigate the allegations of neglect. (Cnty. Defs.' 56.1 Stmt. ¶ 2.) Plaintiff and DJM were not home at the time but Weitzman did interview DJM's father, Myers, who also resided at the home. (Cnty. Defs.' 56.1 Stmt. ¶ 2.) From the end

---

[3] Plaintiff's "Statements of Material Facts Responses" and their exhibits are filed as single documents at Docket Entries 148 and 149. If required to refer to page numbers for any of the exhibits, the Court will use the page numbers supplied by the Case Management/Electronic Case Files system.

of June until the middle of August 2008, Weitzman and other CPS caseworkers made several additional attempts to interview Plaintiff and DJM but were unsuccessful either because Plaintiff and DJM were not home or because they did not answer the door. (Cnty. Defs.' 56.1 Stmt. ¶¶ 2-3; Fernandez Decl., Docket Entry 155, Ex. C. at 1-6.) On August 12, 2008, Weitzman called Myers and asked him to meet her at the home when Plaintiff and DJM were home so that she could interview them, which he agreed to do the next day. (Fernandez Decl. Ex. C at 6.)

On August 13, 2008, Weitzman met Myers at the home and he let her inside. (Cnty. Defs.' 56.1 Stmt. ¶ 3; Fernandez Decl. Ex. C at 6.) Weitzman's progress notes for the visit depict a largely unproductive meeting. According to Weitzman, Plaintiff refused to talk to her and appeared suspicious of the fact that Weitzman and Myers came to the home together. (Cnty. Defs.' 56.1 Stmt. ¶ 3; Fernandez Decl. Ex. C at 6.) Plaintiff repeatedly changed from one unrelated subject of conversation to another, would not allow Weitzman to speak with DJM, and would not answer any of her questions. (Cnty. Defs.' 56.1 Stmt. ¶ 3.)

Over the next six days, additional attempts by Weitzman to speak with Plaintiff and DJM were unsuccessful. (Cnty. Defs.' 56.1 Stmt. ¶¶ 5-7.) However, Myers was at the home at the time of the first visit and he told Weitzman that Plaintiff had engaged in unusual behavior for the last three years, including covering up

the sensors on the home alarm system because she believed the police were monitoring her through it. (Cnty. Defs.' 56.1 Stmt. ¶ 5.) On August 19, 2008 Weitzman asked Myers to meet her at the home the next day so that Weitzman could come with police officers to interview DJM. (Fernandez Decl. Ex. C at 7.)

On August 20, 2008, Weitzman, Myers, and Police Officers Petterson and Barrett of the Nassau County Police Department met at the home. (Cnty. Defs.' 56.1 Stmt. ¶ 8.) According to the County Defendants, Plaintiff was extremely agitated, would not allow Weitzman to speak with DJM, and displayed increasingly irrational behavior. (Cnty. Defs.' 56.1 Stmt. ¶ 8.) For example, Plaintiff would not allow Weitzman to speak with DJM unless Officers Petterson and Barrett arrested her. (Fernandez Decl. Ex. C at 8.) Based on their assessment of Plaintiff's behavior, Weitzman and the police officers believed that Plaintiff was a danger to herself and DJM and the police officers therefore decided to send Plaintiff to the NUMC Psychiatric Unit for a psychiatric evaluation. (Cnty. Defs.' 56.1 Stmt. ¶ 8.)

A detailed recitation of the facts concerning Plaintiff's admission to the NUMC is set forth in the Court's prior order granting summary judgment in favor of the NUMC Defendants. See Johnson v. Myers, No. 10-CV-1964, 2011 WL 6131003, at *1-2 (E.D.N.Y. Dec. 6, 2011). In short, upon arrival at the NUMC, Plaintiff was examined by two staff psychiatrists who diagnosed

her with psychosis, not otherwise specified, rule out delusional disorder. Id. at *1. Dr. St. Victor examined Plaintiff the next day and diagnosed her with rule out delusional disorder and schizophrenia, paranoid type. Id. Plaintiff was deemed a danger to herself and others--she presented as extremely paranoid, guarded, anxious and suspicious; she believed that the police were monitoring her through her burglar alarm system; she reported that she locked herself and DJM in DJM's bedroom in the middle of the night and made him push a heavy desk against the door because she was afraid of Myers; and she had on a prior occasion attempted suicide. Id. She was also advised that she had a urinary tract infection but refused to take any medication to treat it and she refused to sign a release to allow NUMC to obtain information from her prior doctors regarding her psychiatric condition. Id. Dr. St. Victor prescribed Risperdal, an antipsychotic medication, but Plaintiff refused to take it. Id.

Dr. St. Victor discharged Plaintiff on September 2, 2008 because, despite a noticeable degree of suspiciousness, she was no longer believed to be a danger to herself or others. Id. Plaintiff advised Dr. St. Victor that she would not pursue any mental health follow-up treatment, nor was she willing to participate in her discharge planning. Id.

On September 2, 2008, Weitzman spoke with Kara Connors, an employee at the NUMC. Connors advised Weitzman that Plaintiff

was being discharged and that the NUMC had scheduled a follow-up appointment with Dr. Metta for September 10, 2008. (Cnty. Defs.' 56.1 Stmt. ¶ 10.) On September 15, 2008, Weitzman contacted Dr. Metta's office and was advised that Plaintiff failed to keep her follow-up appointment and had not rescheduled. (Cnty. Defs.' 56.1 Stmt. ¶ 12.)

On September 17, 2008, Weitzman met with DJM at Brookside Elementary School in the presence of the school psychologist, Donna Guarton ("Guarton"). (Cnty. Defs.' 56.1 Stmt. ¶ 13.) DJM refused to speak to Weitzman, apparently because Plaintiff instructed him not to speak with CPS. (Cnty. Defs.' 56.1 Stmt. ¶ 13.) Weitzman ended the interview because DJM appeared upset. (Cnty. Defs.' 56.1 Stmt. ¶ 13.) After the interview, Guarton told Weitzman that she believed that Plaintiff was schizophrenic and she shared with Weitzman the letters Plaintiff sent to the Federal Bureau of Investigation and the Commissioner of School on Long Island, which, according to the County Defendants, exhibited paranoia and irrational thoughts. (Cnty. Defs.' 56.1 Stmt. ¶ 14.) Guarton further told Weitzman that on one occasion, Plaintiff refused to sign a written permission slip for DJM to attend a school carnival even though Plaintiff verbally consented to DJM attending the carnival. (Cnty. Defs.' 56.1 Stmt. ¶ 14.)

On October 8, 2008, Plaintiff again was admitted involuntarily to NUMC's Psychiatric Unit after CPS again expressed

concern regarding her ability to care for her son. Johnson, 2011 WL 6131003, at *1. During this second hospitalization, Plaintiff was diagnosed with delusional disorder and rule out psychosis. Id. Plaintiff continued to exhibit paranoid delusions and refused to take any antipsychotic medication so the NUMC filed a petition in the Nassau County Supreme Court seeking permission to involuntarily treat Plaintiff with antipsychotic medication, which was granted by Justice Murphy. Id. Plaintiff was discharged on December 4, 2008 when her delusions and paranoia subsided significantly. Id.

On October 7, 2008, two days prior to Plaintiff's second involuntary hospitalization, CPS filed a Neglect Petition against Plaintiff pursuant to Article 10 of the New York State Family Court Act in the Family Court of the State of New York, County of Nassau (the "Family Court"). (Fernandez Decl. Ex. D.) The Neglect Petition sought a determination that DJM was a neglected child and was supported by statements Myers and Guarton made to CPS, as well as the other observations made during Weitzman's investigation. (Fernandez Decl. Ex. D.)

On March 26, 2009, Myers filed a Family Offense Petition in the Family Court seeking, inter alia, temporary custody of DJM. (Cnty. Defs.' 56.1 Stmt. ¶¶ 23-24; Myers' 56.1 Stmt. ¶ 9). In the Family Offense Petition, Myers alleged that Plaintiff had a history of mental illness, attempted suicide in the past, and that

Plaintiff's delusional and paranoid behavior "was becoming increasingly bizzare [sic] and erratic . . . ." (Fernandez Decl. Ex. F.) On April 20, 2009, the Family Court dismissed the Family Offense Petition for failure to state a claim. (Fernandez Decl. Ex G.)

However, on December 9, 2009, following an inquest, Judge Edmund M. Dane issued a Decision After Inquest granting CPS's Neglect Petition and adjudging DJM to be a neglected child as defined by Family Court Act § 1012(f)(i)(B).[4] (Pl.'s Stmt. to Cnty. Defs.' Mot. at 30-36.) Judge Edmund based his decision "on the credible evidence offered by the Department [of Social

_____

[4] Section 1012(f)(i)(B) of the Family Court Act defines "neglected child" as:

> a child less than eighteen years of age . . . whose physical, mental or emotional condition has been impaired or is in imminent danger of becoming impaired as a result of the failure of his parent or other person legally responsible for his care to exercise a minimum degree of care . . . in providing the child with proper supervision or guardianship, by unreasonably inflicting or allowing to be inflicted harm, or a substantial risk thereof, including the infliction of excessive corporal punishment; or by misusing a drug or drugs; or by misusing alcoholic beverages to the extent that he loses self-control of his actions; or by any other acts of a similarly serious nature requiring the aid of the court . . . .

N.Y. FAM. CT. ACT § 1012(f)(i)(B).

Services]," which included live testimony from Myers, Guarton, and Weitzman. (Pl.'s Stmt. to Cnty. Defs.' Mot. at 35.) Plaintiff failed to appear in Family Court for the scheduled inquest but she was represented by counsel throughout the proceeding. (Pl.'s Stmt. to Cnty. Defs.' Mot. at 30.)

On March 11, 2010, Judge Edmund issued an Order of Disposition placing DJM under the supervision of the Nassau County Department of Social Service. (Pl.'s Stmt. to Cnty. Defs.' Mot. at 37-39.) The Order of Disposition also ordered Plaintiff to comply with an accompanying Order of Protection, which directed Plaintiff to stay away from DJM. (Docket Entry 92-13.) Additionally, Judge Edmund issued an Order of Custody on Default granting Myers custody of DJM. (Fernandez Decl. Ex. H.) There is no evidence that Plaintiff appealed these orderS in the Family Court or that DJM has been returned to her custody. Rather, Plaintiff commenced this action shortly after on April 23, 2010 despite the fact that each of Judge Edmund's orders advised Plaintiff that she could appeal the orders.

DISCUSSION

As noted in the Court's prior order granting summary judgment in favor of the NUMC Defendants, it is unclear what claims Plaintiff asserts because the Complaint merely narrates Plaintiff's version of the facts. See Johnson, 2011 WL 6131003, at *2. However, the Court reads the Complaint very liberally to

assert claims against the County Defendants under 42 U.S.C. § 1983 for false arrest and malicious prosecution in violation of the Fourth Amendment and deprivation of due process in violation of the Fourteenth Amendment. The Complaint may also be read to assert claims against the County Defendants under New York State law for intentional infliction of emotional distress, false arrest, and malicious prosecution. As noted, the Court had previously construed the Complaint to assert a claim against Myers under New York State law for defamation. The Court will first set forth the legal standard on a motion for summary judgment before turning to Defendants' motions specifically.

I.   <u>Legal Standard</u>

Summary judgment is appropriate where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a); <u>see also</u> <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 247, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986); <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986). "In assessing the record to determine whether there is a genuine issue to be tried as to any material fact, the court is required to resolve all ambiguities and draw all permissible factual inferences in favor of the party against whom summary judgment is sought." <u>McLee v. Chrysler Corp.</u>, 109 F.3d 130, 134 (2d Cir. 1997).

13

"The burden of showing the absence of any genuine dispute as to a material fact rests on the party seeking summary judgment." Id.; see also Adickes v. S.H. Kress & Co., 398 U.S. 144, 157, 90 S. Ct. 1598, 26 L. Ed. 2d 142 (1970). A genuine factual issue exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson, 477 U.S. at 248. To defeat summary judgment, "the non-movant must 'set forth specific facts showing that there is a genuine issue for trial.'" Weinstock v. Columbia Univ., 224 F.3d 33, 41 (2d Cir. 2000) (quoting Anderson, 477 U.S. at 256). "[M]ere speculation or conjecture as to the true nature of the facts" will not overcome a motion for summary judgment. Knight v. U.S. Fire Ins. Co., 804 F.2d 9, 12 (2d Cir. 1986); see also Williams v. Smith, 781 F.2d 319, 323 (2d Cir. 1986) ("Mere conclusory allegations or denials will not suffice." (citation omitted)); Weinstock, 224 F.3d at 41 ("[U]nsupported allegations do not create a material issue of fact.").

II.  The County Defendants' Motion for Summary Judgment

     A.   Constitutional Claims

Plaintiff's constitutional claims against the County Defendants arise out of: (1) the child neglect investigation and prosecution conducted by CPS; and (2) Plaintiff's involuntary transportation to the NUMC for a psychiatric evaluation. The Court will address the claims arising out of each incident separately.

1. <u>Neglect Investigation and Prosecution</u>

Liberally construed, Plaintiff's Complaint alleges that Weitzman and Benjamin Malewicz (Weitzman's supervisor) violated Plaintiff's procedural and substantive due process rights under the Fourteenth Amendment and maliciously prosecuted her in violation of the Fourth Amendment when they investigated allegations of child neglect and prosecuted the Neglect Petition against Plaintiff in the Family Court. Additionally, the Complaint specifically "request[s] a court injunction to vacated [sic] and dismiss all documents, petitions, and orders, etc that have been filed in Nassau County Family Court . . . . [and] to be totally exonerated by the court of all claims of abuse and neglect with respect to [her] son . . . ." (Compl. at 5[5].) As discussed below, these claims are barred by the <u>Rooker-Feldman</u> doctrine because they impermissibly seek to collaterally attack the Family Court orders regarding DJM's custody and status as a neglected child. <u>See</u> <u>Dist. of Columbia Court of Appeals v. Feldman</u>, 460 U.S. 462, 103 S. Ct. 1303, 75 L. Ed. 2d 206 (1983); <u>Rooker v. Fidelity Trust Co.</u>, 263 U.S. 413, 44 S. Ct. 149, 68 L. Ed. 362 (1923).

Under the <u>Rooker-Feldman</u> doctrine, federal district courts are prohibited from exercising subject matter jurisdiction

---

[5] The page numbers for the Complaint refer to the page numbers supplied by the Case Management/Electronic Case Files system.

"over suits that are, in substance, appeals from state-court judgments." Hoblock v. Albany Cnty. Bd. of Elecs., 422 F.3d 77, 84 (2d Cir. 2005). "The doctrine applies when a litigant seeks to reverse or modify a state court judgment or asserts claims that are 'inextricably intertwined' with state court determinations." Park v. City of N.Y., No. 99-CV-2981, 2003 WL 133232, at *7 (S.D.N.Y. Jan. 16, 2003). The Second Circuit has held that there are four requirements for the application of the Rooker-Feldman doctrine:

> First, the federal-court plaintiff must have lost in state court. Second, the plaintiff must complain of injuries caused by a state-court judgment. Third, the plaintiff must invite district court review and rejection of that judgment. Fourth, the state-court judgment must have been rendered before the district court proceedings commenced--i.e., Rooker-Feldman has no application to federal-court suits proceeding in parallel with ongoing state-court litigation.

Hoblock, 422 F.3d at 85 (internal citations, quotations marks, brackets, and footnote omitted) (emphasis added). "The first and fourth of these requirements may be loosely termed procedural; the second and third may be termed substantive." Id.

Here, there is no question that Plaintiff seeks to directly challenge and reverse the Family Court's prior orders adjudging DJM to be a neglected child and granting Myers custody of DJM. The Complaint explicitly requests such relief. (Compl. at 5.) However, Rooker-Feldman precludes this Court from reviewing

16

the Family Court's orders. With respect to the procedural requirements, first, Plaintiff "lost" in state court when the Family Court issued these orders. See Davis v. Baldwin, No. 12-CV-6422, 2013 WL 6877560, at *3 (S.D.N.Y. Dec. 31. 2013) (holding that plaintiff "lost" in state court pursuant to family court's orders of removal and protection placing plaintiff's children in care of children's services and precluding plaintiff from interfering with the care and custody of his children); Allen v. Mattingly, No. 10-CV-0667, 2011 WL 1261103, at *8 (E.D.N.Y. Mar. 29, 2011) (holding that plaintiff "lost" in state court pursuant to both temporary and final orders of the family court removing plaintiff's son from her custody and placing him in foster care), aff'd, 479 F. App'x 712 (2d Cir. 2012). Second, the Decision After Inquest, dated December 9, 2009; the Order of Disposition, dated March 11, 2010; the Order of Protection, dated March 12, 2010, and the Order of Custody on Default, dated March 11, 2010; all were issued before this action was commenced on April 23, 2010.

The substantive requirements are also met. As noted, the two substantive requirements that must be met for the Rooker-Feldman doctrine to apply are: (1) the plaintiff must complain of injuries caused by a state-court judgment; and (2) the plaintiff must invite district court review and rejection of that judgment. Here, the Complaint specifically "request[s] a court injunction to vacated [sic] and dismiss all documents, petitions, and orders,

17

etc that have been filed in Nassau County Family Court . . . .
[and] to be totally exonerated by the court of all claims of abuse
and neglect with respect to [her] son . . . ." (Compl. at 5.)
Thus, Plaintiff clearly complains of injuries caused by the Family
Court's judgments and invites the Court to review and reject them.
The Rooker-Feldman doctrine therefore precludes the Court from
reviewing the Family Court orders. See Phifer v. City of N.Y.,
289 F.3d 49, 57 (2d Cir. 2002) (holding that the plaintiff's claims
seeking an order directing children's services to return
plaintiff's child to her custody were barred by the Rooker-Feldman
doctrine); Davis, 2013 WL 6877560, at *5 (holding that plaintiff's
request for "relief [from] all [family court] orders made in
violation of the law" was barred by the Rooker-Feldman doctrine
(first alteration in original)); Allen, 2011 WL 1261103, at *8
("[T]he Rooker-Feldman doctrine divests this Court of subject
matter jurisdiction to hear plaintiff's claims relating to the
removal of her son from her custody, his placement in foster care
and her visitation with her son."); Mercedes ex rel. Brown v. Blue,
No. 00-CV-9225, 2004 WL 2202578, at *8 (S.D.N.Y. Sept. 30, 2004)
("The Court concludes that it does not have subject matter
jurisdiction to review the Family Court's disposition, including
the . . . Order approving the removal of children from
[plaintiff's] custody, under Rooker-Feldman . . . .").
Accordingly, the County Defendants' motion for summary judgment is

GRANTED insofar as Plaintiff requests a review of the Family Court's prior orders.

The more nuanced inquiry in this case is whether <u>Rooker-Feldman</u> divests this Court of subject matter jurisdiction over Plaintiff's malicious prosecution and due process claims. The Court finds that it does. With respect to the malicious prosecution claim, the Family Court has already decided that Plaintiff neglected DJM and the relief sought under the malicious prosecution claim would effectively reverse the Family Court's findings. <u>See</u> <u>Mercedes</u>, 2004 WL 2202578, at *8 (holding that plaintiff's claim of malicious prosecution in family court was barred by <u>Rooker-Feldman</u> because such claim would require the court to reexamine the family court's order removing plaintiff's children from her custody); <u>Richards v. City of N.Y.</u>, No. 97-CV-7990, 2003 WL 21036365, at *10 (S.D.N.Y. May 7, 2003) ("[I]f the Family Court in this case decided that defendants had a reasonable ground to separate Richards from the children, the Court actually and necessarily decided the issue presented in this § 1983 action."). Accordingly, the County Defendants' motion for summary judgment on Plaintiff's malicious prosecution claim is GRANTED.[6]

---

[6] Even if <u>Rooker-Feldman</u> did not apply to Plaintiff's malicious prosecution claim, however, her claim would fail anyway because the Family Court proceedings did not terminate in Plaintiff's favor. <u>See</u> <u>Green v. Mattingly</u>, 585 F.3d 97, 103-04 (2d Cir. 2009) (affirming district court's dismissal of plaintiff's claim that child neglect proceeding was maliciously prosecuted because

Rooker-Feldman also precludes the Court from adjudicating Plaintiff's procedural due process claim. Although not entirely clear, it appears that Plaintiff claims that her procedural due process rights were violated by virtue of false allegations made by Myers and Guarton in the neglect proceeding in the Family Court. However, as noted above, Plaintiff lost the neglect proceeding and the Family Court awarded custody of DJM to Myers. The Court finds that Plaintiff's procedural due process claim is traceable directly to the Family Court orders and that it improperly invites review and rejection of these orders. Thus, Rooker-Feldman divests this Court of jurisdiction over Plaintiff's procedural due process claim. See Kaminski v. Comm'r of Oneida Cnty. Dept. of Soc. Servs., 804 F. Supp. 2d 100, 105-06 (N.D.N.Y. Aug. 5, 2011) (holding that plaintiffs' procedural due process claim that complained of "false evidence, contradicting statements, and perjured declarations" in the underlying Family Court proceeding was barred by Rooker-Feldman). Accordingly, the

---

plaintiff failed to allege termination of the proceeding in plaintiff's favor, a required element for a malicious prosecution claim); Williams v. Jurow, No. 05-CV-6949, 2007 WL 5463418, at *15 (S.D.N.Y. June 29, 2007) ("Because plaintiff has not alleged that the Family Court proceeding terminated in her favor, plaintiff's malicious prosecution claim fails to state a claim as to the Municipal Defendants upon which relief may be granted.") report and recommendation adopted and modified on other grounds by 2008 WL 4054421 (S.D.N.Y. Aug. 28, 2008). Accordingly, this serves as an additional basis for summary judgment in the County Defendants' favor.

County Defendants' motion for summary judgment on Plaintiff's procedural due process claim is GRANTED.[7]

Plaintiff's substantive due process claim also suffers from a lack of clarity but the Court interprets it as challenging Weitzman's investigation of neglect allegations and CPS's subsequent prosecution of the neglect proceeding against Plaintiff. This claim is also barred by <u>Rooker-Feldman</u>. In light of the "compelling government interest in the protection of minor children," the Second Circuit

> has adopted a standard governing case workers which reflects the recognized need for unusual deference in the abuse investigation context. An investigation passes constitutional muster provided simply that case workers have a "reasonable basis" for their findings of abuse . . . . In applying a reasonableness standard in the abuse context, courts must be especially sensitive to the pressurized circumstances routinely confronting case workers, circumstances in which decisions between "difficult alternatives" often need to be made on the basis of limited or conflicting information.

---

[7] Plaintiff's procedural due process claim also fails on the merits. As a general rule, before a parent is deprived of the care, custody, or management of their children without consent, procedural due process is ordinarily met through "a court proceeding resulting in an order [approving], permitting[, or ordering] removal" of the children. <u>Graham v. City of N.Y.</u>, 869 F. Supp. 2d 337, 350 (E.D.N.Y. 2012) (citations omitted) (alterations in original). The neglect proceeding in this case complied with due process. Plaintiff was represented by counsel throughout the proceeding and she had the opportunity to appeal each and every order rendered by the Family Court but did not. Accordingly, this serves as an additional basis for summary judgment in the County Defendants' favor.

Wilkinson v. Russell, 182 F.3d 89, 104-05 (2d Cir. 1999). "[T]he reasonable basis test places certain constitutional limitations on case workers, i.e., their decisions to declare claims of abuse substantiated must be consistent with some significant portion of the evidence before them." Id. at 108.

Thus, for Plaintiff's substantive due process claim to succeed, Plaintiff would have to demonstrate that Weitzman and CPS lacked a reasonable basis to investigate and prosecute the allegations of child neglect against Plaintiff. In order to reach this finding, the Court would necessarily have to review the Family Court's order adjudging DJM to be a neglected child under the Family Court Act and find that the Family Court wrongly decided this issue. Rooker-Feldman prohibits such a review. See Park, 2003 WL 133232, at *10 (holding that plaintiffs' substantive due process claim challenging children's services' decision to remove children from plaintiff's custody was barred by Rooker-Feldman because the Family Court decided such issue when it found the children to be neglected under the Family Court Act). Accordingly, the County Defendants' motion for summary judgment on Plaintiff's substantive due process claim is GRANTED.[8]

---

[8] Additionally, the undisputed facts demonstrate that Weitzman had not only a reasonable, but overwhelming, basis to support a finding of neglect as she herself observed Plaintiff display irrational and paranoid behavior on several occasions. Not only did Weitzman observe this behavior, but she also corroborated her observations with allegations and evidence provided by DJM's father, Myers, and

2. <u>Involuntary Transportation to the NUMC</u>

Plaintiff alleges that she was falsely arrested when Officer Petterson "handcuffed" her and transported her to the NUMC for a psychiatric evaluation. (Compl. at 3.) The County Defendants argue that summary judgment on this claim is appropriate because (1) Officer Petterson's decision to send Plaintiff for a psychiatric evaluation was privileged pursuant to New York Mental Hygiene Law § 9.41, (Cnty. Defs.' Br., Docket Entry 157, at 12-14); and (2) Officer Petterson is in any event entitled to qualified immunity, (Cnty. Defs.' Br. at 20-22). As discussed below, the Court cannot say based on the record before it that Officer Peterson's decision to involuntarily transport Plaintiff to the NUMC was privileged under Section 9.41. However, the Court does find that Officer Petterson is entitled to qualified immunity.

"A § 1983 claim for false arrest, resting on the Fourth Amendment right of an individual to be free from unreasonable seizures . . . is substantially the same as a claim for false

---

the school psychologist, Guarton. Additionally, Plaintiff was twice admitted involuntarily to the NUMC where she was diagnosed with psychotic disorders. She was hospitalized the second time after failing to follow through with recommended treatment and she refused to take her prescribed anti-psychosis medication. The Court therefore finds that Weitzman conducted her investigation in a proper manner. Thus, this ground serves as an alternative basis for summary judgment on Plaintiff's substantive due process claim in the County Defendants' favor.

arrest under New York law." Weyant v. Okst, 101 F.3d 845, 852 (2d
Cir. 1996). Under New York law, the elements of false arrest are:
"'(1) the defendant intended to confine [the plaintiff], (2) the
plaintiff was conscious of the confinement, (3) the plaintiff did
not consent to the confinement and (4) the confinement was not
otherwise privileged.'" Singer v. Fulton Cnty. Sheriff, 63 F.3d
110, 118 (2d Cir. 1995) (alteration in original) (quoting Broughton
v. State, 37 N.Y.2d 451, 456, 335 N.E.2d 310, 373 N.Y.S.2d 87
(1975)).

The Fourth Amendment prohibits "unreasonable searches
and seizures." U.S. CONST. amend. IV. A "seizure" for Fourth
Amendment purposes occurs "when government actors have, 'by means
of physical force or show of authority, . . . in some way restrained
the liberty of a citizen.'" Glass v. Mayas, 984 F.2d 55, 58 (2d
Cir. 1993) (quoting Graham v. Connor, 490 U.S. 386, 395 n. 10, 109
S. Ct. 1865, 1871 n. 10, 104 L. Ed. 2d 443 (1989)). "[T]he
protection against unreasonable searches and seizures fully
applies in the civil context." Soldal v. Cook Cnty., Ill., 506
U.S. 56, 67 n. 11, 113 S. Ct. 538, 121 L. Ed. 2d 450 (1992); accord
Glass, 984 F.2d at 58 ("That [the plaintiff's] seizure occurred in
the civil context does not render the Fourth Amendment
inapplicable."). Thus, under the Fourth Amendment, "a competent
adult [can]not be seized and transported for [medical] treatment

unless she present[s] a danger to herself or others." <u>Green v.</u>
<u>City of N.Y.</u>, 465 F.3d 65, 85 (2d Cir. 2006).

The County Defendants first argue that summary judgment
on the false arrest claim is appropriate because Officer
Petterson's decision to send Plaintiff for a psychiatric
evaluation was privileged pursuant to New York Mental Hygiene Law
§ 9.41. (Cnty. Defs.' Br. at 12-14.) Section 9.41 states in
relevant part:

> Any peace officer, when acting pursuant to his
> or her special duties, or police officer who
> is a member of the state police or of an
> authorized police department or force or of a
> sheriff's department may take into custody any
> person who appears to be mentally ill and is
> conducting himself or herself in a manner
> which is likely to result in serious harm to
> the person or others. Such officer may direct
> the removal of such person or remove him or
> her to any hospital specified in subdivision
> (a) of section 9.39 or any comprehensive
> psychiatric emergency program specified in
> subdivision (a) of section 9.40 . . . .

N.Y. Mental Hyg. Law § 9.41. The phrase "likely to result in serious
harm" is defined as:

> (a) a substantial risk of physical harm to the
> person as manifested by threats of or attempts
> at suicide or serious bodily harm or other
> conduct demonstrating that the person is
> dangerous to himself or herself, or (b) a
> substantial risk of physical harm to other
> persons as manifested by homicidal or other
> violent behavior by which others are placed in
> reasonable fear of serious physical harm.

<u>Id.</u> § 9.01.

If Officer Petterson's decision to transport Plaintiff to the NUMC was legally justified under the Section 9.41, then Plaintiff's seizure was privileged and her federal and state law claims fail as a matter of law. Amato v. Hartnett, 936 F. Supp. 2d 416, 435 (S.D.N.Y. 2013) (citing Glowczenski v. Taser Int'l Inc., No. 04-CV-4052, 2010 WL 1936200, at *5 (E.D.N.Y. May 13, 2010)); Bayne v. Provost, No. 04-CV-0044, 2005 WL 1871182, at *6 (N.D.N.Y. Aug. 4, 2005) (citations omitted). For the Section 9.41 privilege to apply, Officer Petterson must have possessed probable cause to conclude that Plaintiff was acting in a manner that would justify a [Section 9.41] seizure." Bayne, 2005 WL 1871182, at *6 (citing Sanchez v. Town of Greece, No. 98-CV-6433, 2004 WL 1964505, at * 4 (W.D.N.Y. Sept. 1, 2004)) accord Amato, 936 F. Supp. 2d at 435. In determining whether probable cause exists under Section 9.41, courts apply the same objective reasonableness standard applied in the Fourth Amendment context. See Kerman v. City of N.Y., 261 F.3d 229, 240 n.8 (2d Cir. 2001) ("We interpret [§ 9.41] . . . consistently with the requirements of the Fourth Amendment and therefore assume that the same objective reasonableness standard is applied to police discretion under this section. Therefore, our constitutional analysis controls this state law issue as well."). In this context, the probable cause inquiry asks "whether the facts and circumstances known to the officers at the time they seized Plaintiff were sufficient to

warrant a person of reasonable caution to believe that [she] might be mentally ill and conducting [herself] in a manner likely to result in serious harm to [herself or others]." Amato, 936 F. Supp. 2d at 435 (quoting Nicholas v. City of Binghamton, No. 10-CV-1565, 2012 WL 3261409, at *5 (N.D.N.Y. Aug. 8, 2012).

The Court cannot say based on the record before it that Officer Petterson had probable cause to believe that Plaintiff was acting in a manner that would justify a Section 9.41 seizure. As noted above, a Section 9.41 seizure must be based on (1) a substantial risk of physical harm to the person seized "as manifested by threats of or attempts at suicide or serious bodily harm or other conduct demonstrating that the person is dangerous to himself or herself" or (2) a substantial risk of physical harm to other persons "as manifested by homicidal or other violent behavior by which others are placed in reasonable fear of serious physical harm." The only evidence the County Defendants have provided regarding the moments leading up to Officer Petterson's decision to involuntarily hospitalize are Weitzman's progress notes describing the encounter on August 20, 2008. Although the progress notes do indicate that Plaintiff was mentally unstable, they present no evidence that Officer Petterson or Weitzman witnessed Plaintiff threaten her own life or display behavior indicating that she was considering harming herself. In fact, Weitzman only learned that Plaintiff had attempted suicide the day

after Officer Peterson and Weitzman decided to transport Plaintiff to the NUMC. (See Fernandez Decl. Ex. C at 8.) Additionally, there is no evidence that Plaintiff "manifested homicidal or other violent behavior" placing DJM at risk of serious physical harm. Accordingly, the Court cannot say that no rational jury could find that Officer Peterson lacked probable cause to believe that Plaintiff was acting in a manner that would justify a Section 9.41 seizure.

However, the Court does find that Officer Petterson's actions are entitled to qualified immunity. Under the doctrine of qualified immunity, police officers are immune from liability for false arrest claims if either "'(a) it was objectively reasonable for the officer to believe that probable cause existed, or (b) officers of reasonable competence could disagree on whether the probable cause test was met.'" Lennon v. Miller, 66 F.3d 416, 423-24 (2d Cir. 1995) (quoting Golino v. City of New Haven, 950 F.2d 864, 870 (2d Cir. 1991)). Accordingly, summary judgment is appropriate if "a rational jury could not find that the officers' judgment was so flawed that no reasonable officer would have made a similar choice." Id. at 420-25. "The doctrine of qualified immunity serves to protect police from liability and suit when they are required to make on-the-spot judgments in tense circumstances." Id. at 424 (citing Calamia v. City of N.Y., 879 F.2d 1025, 1034-35 (2d Cir. 1989)).

In this Court's view, based on Officer Petterson's observations and the fact that he was accompanying Weitzman to Plaintiff's home as part of a continuing CPS investigation of allegations of child neglect, it was objectively reasonable to believe that Plaintiff posed a danger to herself and DJM even if she did not directly threaten suicide or act in a violent manner towards DJM. Plaintiff was hostile and uncooperative and refused to allow Weitzman to interview DJM unless the police officers arrested her. She became progressively irrational and the County Defendants were already aware that Plaintiff had displayed unusual behavior in the past. The Court has already ruled in this case that the NUMC psychiatrists who involuntarily committed Plaintiff were entitled to qualified immunity on Plaintiff's claim that she was wrongfully hospitalized, and the Court similarly finds that Officer Petterson is entitled to qualified immunity as well. Accordingly, summary judgment is GRANTED on Plaintiff's false arrest claim.

B. State Law Claims

The County Defendants assert that Plaintiff's state law claims must be dismissed for failure to serve a notice of claim as required by New York General Obligations Law §§ 50-i, 50-e. The Court agrees.

New York General Municipal Law § 50-e requires a plaintiff to file a notice of claim prior to commencing an action

in tort against a municipality or one of its employees but no more than ninety days after the cause of action accrued.  See N.Y. Gen. Mun. Law §§ 50-e, 50-i; cf. Warner v. Vill. of Goshen Police Dep't, 256 F. Supp. 2d 171, 175 (S.D.N.Y. 2003) ("The notice of claim requirements apply equally to state tort claims brought as pendent claims in federal civil rights actions." (citation omitted)). Here, Plaintiff never filed a notice of claim, nor did she ever request an extension of time to do so.  As such, Plaintiff's state law claims against the County Defendants must be dismissed.  See Davidson v. Bronx Mun. Hosp., 64 N.Y.2d 59, 61-62, 473 N.E.2d 761, 763, 484 N.Y.S.2d 533, 535 (1984) ("Failure to comply with provisions requiring notice and presentment of claims prior to commencement of litigation ordinarily requires dismissal." (citation omitted)).

Accordingly, the Court GRANTS the County Defendants' motion for summary judgment with respect to Plaintiff's state law claims.

III. Myers' Motion for Summary Judgment

As noted, the Court reads the Complaint to assert a state law defamation claim against Myers.  While it is not entirely clear, Plaintiff appears to allege that Myers defamed her when he made "false allegations" of "abuse of neglect with respect to [DJM]" to CPS and to the Family Court.  (Compl. at 5.) Additionally, Plaintiff also appears to allege that Myers made

defamatory statements in the March 29, 2009 Family Offense Petition that he filed in the Family Court. (Compl. at 5.) As discussed below, summary judgment is appropriate on all allegations against Myers.

First, Plaintiff's claim that Myers defamed her when he made false allegations to CPS and the Family Court is barred by the Rooker-Feldman doctrine because the Family Court relied on these statements in reaching its finding that DJM was a neglected child as defined under the Family Court Act. Although Plaintiff's claim is one "dressed up" as a defamation claim, Plaintiff really seeks to reverse the Family Court's orders. See Chase v. Czajka, No. 04-CV-8228, 2005 WL 668535, at *5 (S.D.N.Y. Mar 23, 2005) (holding that defamation claim was barred by Rooker-Feldman because "the basis of [plaintiff's] complaint concerns decisions made or pending before the Family Court").

Second, the statements that Myers made in the Family Offense Petition cannot form the basis of Plaintiff's defamation claim because they are absolutely privileged under New York law.[9]

---

[9] As the Court previously held in its order denying Myers' motion to dismiss Plaintiff's defamation claim, the Rooker-Feldman doctrine does not apply to Plaintiff's defamation claim arising out of the Family Offense Petition because the Family Court dismissed the Family Offense Petition for failure to state a claim. Thus, with respect to this petition, Plaintiff was not a state court loser and Rooker-Feldman therefore does not apply. Johnson v. Myers, No. 10-CV-1964, 2011 WL 809999, at *8-9 (E.D.N.Y. Feb. 23, 2011).

"Under New York law, 'in the context of a legal proceeding, statements by parties and their attorneys are absolutely privileged if, by any view or under any circumstances, they are pertinent to the litigation.'" O'Brien v. Alexander, 898 F. Supp. 162, 171 (S.D.N.Y. 1995) (citing Grasso v. Mathew, 164 A.D.2d 476, 564 N.Y.S.2d 576, 578 (3d Dept. 1991)). The absolute privilege applies to, inter alia, statements made in pleadings and in court. Id. (citation omitted). The statements at issue were made in a pleading submitted to the Family and therefore are absolutely privileged. Accordingly, summary judgment on Plaintiff's defamation claim against Myers is GRANTED.

CONCLUSION

For the foregoing reasons, the County Defendants' and Myers' motions for summary judgment are GRANTED. The Clerk of the Court is directed to enter judgment accordingly and CLOSE this case.

The Court certifies pursuant to 28 U.S.C. § 1915(a)(3) that any appeal from this Order would not be taken in good faith and therefore in forma pauperis status is denied for purpose of an appeal. Coppedge v. United States, 369 U.S. 438, 444–45, 82 S. Ct. 917, 8 L. Ed. 2d 21 (1962).

The Clerk of the Court is directed to mail a copy of this Memorandum and Order to pro se Plaintiff.

SO ORDERED.

/s/ JOANNA SEYBERT
Joanna Seybert, U.S.D.J.

Dated:     June __16__, 2014
           Central Islip, NY